[Cite as *In re J.P.*, 2015-Ohio-4882.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| In re   J.P. | : | Case No. 15CA29 |
|          M.S.P. | : | |
| | : | |
| Adjudicated neglected | : | <u>DECISION AND</u> |
| and dependent | : | <u>JUDGMENT ENTRY</u> |
| children | : | RELEASED: 11/20/2015 |

<u>APPEARANCES</u>:

Frank A. Lavelle, Athens, Ohio for appellant.

Keller J. Blackburn, Athens County Prosecuting Attorney, and Merry M. Saunders, Athens County Assistant Prosecuting Attorney, Athens, Ohio for appellee Athens County Children Services

Hoover, P.J.

{¶1}     Appellant B.P. appeals the trial court's decision awarding permanent custody of her two children to appellee Athens County Children Services ("ACCS"). B.P. argues that the trial court's decision to grant permanent custody to ACCS was "extreme, contrary to law and not in the children's best interest." She argues that analysis of the best interest factors weigh in favor of granting her parental custody rights. Second, B.P. contends that the trial court's determination that the children could not be placed with either parent within a reasonable period of time and should not be placed with the parents was against the manifest weight of the evidence. She argues that there was insufficient evidence that her mental illness was so severe that it made her unable to provide an adequate permanent home. She further claims that the court's finding that she has demonstrated multiple instances of neglect that makes placement of the children with her a threat to the children's safety is based on "two isolated, unique occasions" and does not rise to

the level of serious neglect. She argues that the trial court's finding that her "own dependency and demonstrated lack of ability to address basic life issues make it unsafe to return her biological children to her care and custody" ignores the fact that she successfully addressed these concerns and had her children returned to her briefly in the previous year.

{¶2}     For the reasons that follow, we find that the trial court's findings are not against the manifest weight of the evidence. Accordingly, we affirm the trial court's judgment.

## I. Facts and Procedural Posture

{¶3}     In July 2012, ACCS took custody of B.P.'s children, J.P. and M.S.P., due to concerns regarding domestic violence, the parents' mental health, and their ability to safely parent their children. The children were two years old and six months old when they were placed in the custody of ACCS. The children remained in the temporary custody of ACCS for approximately a year and a half.

{¶4}     In late January 2014, the children were returned to B.P.; but B.P. was only able to retain custody for about four months. During the period the children were in B.P.'s custody, ACCS was granted a protective supervision order. The children's father moved out of state and had no contact with the children after February 2014. On two different occasions during the few months that the children were in B.P.'s custody, the children were found outside playing in the street without adequate supervision and without adequate clothing. After the second incident in mid-May 2014, the children were removed from B.P.'s custody and again placed in the temporary custody of ACCS.

{¶5}     ACCS then filed complaints in September 2014 seeking permanent custody and alleging that J.P. and M.S.P. were neglected and dependent.[1] ACCS alleged that after the

---

[1] When ACCS filed the 2014 complaints, it filed a motion seeking to consolidate the 2014 cases with the 2012 cases, filed on July 20, 2012, under which ACCS held custody of the children.  The trial court denied the motion to

children were returned to B.P. in January 2014, they were found outside playing in the street

without adequate clothing in March 2014. B.P. did not know that the children had left the home.

A court review was held in April 2014; and B.P. continued to retain custody while ACCS

continued protective supervision. Then, again in May 2014, the children were found outside

unsupervised in the street. As a result, the children were returned to the temporary custody of

ACCS on an emergency ex parte order.

{¶6}    ACCS alleged that its primary concerns with the parents are their mental health

diagnoses and their lack of supervision of the children. ACCS states that the father was

diagnosed with paranoid schizophrenia and has been unable to display appropriate and safe

parenting skills. Additionally, he moved out of state and has not had contact with his children

since February 2014.

{¶7}    ACCS alleged that B.P. has been diagnosed as bipolar in addition to borderline

personality disorder and has not followed through consistently with counseling for herself or her

children. According to the complaint, at the time B.P. regained custody of her children in

January 2014, both children were enrolled in speech therapy and her older child, J.P., was

enrolled in mental health counseling.  However, within the first month of having full care and

custody, both children were terminated from speech therapy due to lack of attendance. J.P.

attended only four of the ten mental health counseling sessions scheduled between January 2014

and May 2014.

{¶8}    At a hearing in April 2015, the trial court found the children to be neglected and

dependent and ordered them to remain in the temporary custody of ACCS. The trial court's

determination that the children were neglected was based on evidence at the hearing that their

---

consolidate the cases and instead dismissed the 2012 cases and granted Appellee custody under the 2014 cases. The
cases then proceeded forward on the 2014 complaints.

father moved to another state, no longer participated in their lives, and provided no support or care. The court found that B.P. failed to adequately supervise the children, who were approximately four and two years old during the January to May 2014 period. "On at least two recent occasions the children have left the home, unsupervised, and without anyone's knowledge and ultimately been discovered by others." The trial court also found that B.P. "has demonstrated great difficulty in performing the most basic parenting functions with her children" and that her mental health issues cause her to be frequently " 'too sick' to participate in routine activities meant to strengthen her skills and abilities related to child rearing."

{¶9}     B.P. testified that in March 2014, when her children were found unsupervised, she awoke that morning at 8:30 or 9:00 to someone knocking on her door. Her children had been found outside in bad weather in pajamas and no shoes.  Another witness corroborated the testimony and added that the children had been found playing on State Route 78. B.P. testified that in May, she was awoken by a knock on the door. A police officer informed her that her children were found outside—one was naked; and both were playing in the road.

{¶10}  The court held a permanent custody hearing. At the hearing, Stephanie Blaine, a kinship caseworker, testified that she investigated possible relative placement. Placement with B.P.'s mother was found inappropriate because a background check revealed that she had a number of DUI offenses spanning several years and was considered a habitual DUI offender. In addition, B.P. had expressed prior concerns to caseworkers about her mother's drinking. B.P. testified that she had been living with her mother in January 2014 when she received custody of her children, but that she fought with her mother over her mother's drinking and moved herself and her children in with a male friend. However, she left his home and returned back to her mother's house because the friend was smoking marijuana in the presence of her children.

{¶11}   Tara Carsey, a family services caseworker, testified that she had been working with B.P. and her children since July 2012. Carsey testified that the children had been in the custody of ACCS from July 2012 through January 2014, when they were returned to B.P. The ACCS regained custody of the children in May 2014. Carsey testified that the children's father was unable to appropriately or adequately supervise the children during visitation sessions and moved out of state and had not responded to recent attempts to reach him by phone or letter. Carsey testified that the father's mental health issues are severe; and he is not able to safely supervise or provide parenting for the children.

{¶12}   Carsey also testified that she worked continuously with B.P. since 2012. While the children were in the custody of ACCS in 2012-2013, Carsey set up speech and counseling services for the children. When custody was given to B.P in January 2014, Carsey arranged for a parent mentor for B.P. and transportation services, and explained the importance of having the children attend their various appointments. Despite this assistance, B.P. failed to take the children to their appointments and failed to give notice of cancellation such that the children's counseling and therapy services were terminated and had to be restarted again by ACCS when it regained custody in May 2014. Carsey testified that B.P.'s circumstances have not changed since Appellee regained custody of the children; and the children cannot safely be in her care.  She stated that the children's need for a safe and stable home could not be met by B.P.. She is not able to provide safe, consistent living arrangements; and she cannot get or keep therapy and counseling appointments the children need.

{¶13}   The guardian ad litem, Yumi Choe, testified that while B.P. could have the potential to be a safe custodian for the children because "she's their mother and she's more focused," she still had concerns with B.P. and more time would be needed to evaluate the

situation. Choe testified that one factor that caused concern was B.P.'s failure to provide adequate supervision during the brief period the children were returned to her care. Choe further stated that she continued to have concerns with B.P.'s lack of income, stable housing, parenting skills, and inability to provide a consistently safe environment through supervision. However, Choe was unsure whether ACCS should be granted permanent custody. When asked by B.P.'s attorney if it was her opinion that it would be premature to permanently terminate B.P.'s parental rights at this time, Choe answered, "Mmm, probably yes." When asked by counsel for ACCS how much longer the children should "remain in limbo" while waiting for B.P. to make further progress when she has had three years already, Choe stated, "I just at this point don't know if it's better with [B.P.] or not with [B.P.]."

{¶14} The foster parent, Charles Price, testified that during the year the children had resided in his home, B.P. had only occasionally telephoned to speak to the children. She was not consistent in maintaining a telephone call schedule.

{¶15} Jennifer Pinney, a visitation worker, testified that she witnessed visitations B.P. had with the children. Pinney testified that she was concerned about B.P.'s ability to provide adequate supervision because during one of the visitation sessions one of the children had left the room and was gone for five minutes before B.P. left to search for the child. Pinney stated that B.P. attempted to get the children to take naps or rest during visitations instead of playing or interacting with them. She also testified that during one of the visitations, B.P. was determined to take the children outside even though Pinney had informed her that a doctor had excused one of the children from outside play. The doctor advised against the child playing outside because the child's asthma had been triggered from the high pollen count; and the child had been wheezing. According to Pinney, B.P. became agitated, vulgar, and cursed at her in front of the children.

{¶16} B.P. testified about these visitations and agreed that the visitations did not go well but that it was because she was emotional and afraid that ACCS was going to gain permanent custody of her children. B.P. also testified that she has learned coping skills such as deep breathing and plans to continue the parent-mentoring services if she were to regain custody.

{¶17} B.P.'s father testified that he would be available to provide transportation for the children should B.P. regain custody. However, he also testified that he had been available to provide transportation during the four months B.P. had custody and was unaware that the children had missed numerous appointments. He was also unaware that the children had their services discontinued because they had missed so many appointments.

{¶18} B.P.'s fiancé testified that he would like to provide for the children. However, he currently lives with his mother and receives disability payments. Even though he has a driver's license and would be willing to transport the children, he does not own a car. He testified that he plans to marry B.P. as soon as she is divorced from the children's father. He did concede, however, that he and B.P. have been together for about a year and B.P. had not initiated divorce proceedings.

{¶19} B.P.'s mother, Z.R., testified that she rents a clean, three-bedroom home where B.P. resides. Z.R. receives social security disability, vouchers for utilities, food stamps, and rent support through HUD. If B.P. regains custody, Z.R. stated that she would be willing to support B.P. and care for the children. Z.R. testified that she has a driver's license, insurance, and a car. She testified that she has had multiple DUI convictions and is on the habitual DUI offender list. In 2013, she received treatment for alcohol and regained her driver's license. She testified that she continues to drink alcohol and goes out drinking weekly, though she claims she no longer drives when going out. She testified that she "might have a beer or two" at home as well. She

stated that there would be no reason why she would not be able to drive the children to their appointments.

{¶20} B.P. testified that things would be different this time compared to the last time if she were to regain custody. She believes she could benefit from the parent-mentoring program and has chains on the doors now. She believes she has a network of resources to call on for transportation and would like to move in with her fiancé and have him be involved in her children's lives. She testified that her mother, Z.R., would be very supportive. She also testified that she has applied for several jobs and believes that with her mother's help, she can provide everything the children need. However, B.P. conceded that, the last time she had regained custody, she had the same support structures in place. She had parent-mentoring, locks on the doors, the same network of support for transportation, and the same level of support from her mother. Nevertheless, the children were placed back into the custody of ACCS. She also conceded that although caseworker Carsey had set up an appointment for her for vocational services, she had missed that appointment and had not rescheduled it. B.P. also agreed that she had been living with her mother the first time she regained custody and moved out because of her mother's drinking problem. B.P. also testified that she was still "in the process" of preparing to file for a divorce and preparing to take steps to obtain her driver's license.

{¶21} The trial court awarded ACCS permanent custody finding, "The hallmarks of this case are mental health, supervision and safety, and lack of a reliable support network." Pursuant to R.C. 2151.353(A)(4), the trial court committed the children, who had been previously adjudicated neglected and dependent, to the permanent custody of ACCS because the children could not be placed with one of the children's parents within a reasonable time and should not be

placed with either parent in accordance with R.C. 2151.414(E) and permanent placement was in the children's best interest in accordance with R.C 2151.414(D)(1).

{¶22}  The trial court examined the factors outlined in the best interest analysis in R.C. 2151.414(D)(1)(a) -(e) and found that the children's best interests would be served by permanent custody with ACCS. As to factor (D)(1)(a) (the interaction and interrelationship of the children with parents, relatives, foster caregivers and others who may significantly affect them), the court determined that the children had bonded with their foster family, their biological father had abandoned the children, and that visits with B.P. had "mixed reviews with mom frequently being 'sick' or 'too tired' to participate meaningfully * * * The children's attachment and bond with their mother is less clear, with mother only occasionally taking advantage of opportunities to have at least telephone contact with her daughters."

{¶23}  As to factor (D)(1)(b)(child's wishes), the trial court determined that the children were too young to have their wishes given much weight.

{¶24}  In considering factor (D)(1)(c)(custodial history), the trial court found that the children had been in the custody of ACCS since July 2012, except for a brief return back to B.P. from January 23, 2014 to May 14, 2014. Prior to July 2012, the children lived with their mother and sometimes their father; and a couple of occasions B.P. has taken them to live with men in other residences, though the court found the specifics of those arrangements unclear. As to the children's need for a legally secure placement and whether it can be achieved without grant of permanent custody to the agency, the trial court found that the children's father has abandoned them.  The trial court found significant issues with B.P.:

> Mother has multiple mental health diagnoses and is prescribed psychotropic
> medication. She regularly demonstrates periods of frustrating fatigue, or even

"illness", when the children are her responsibility. During the few months the children were returned to her care, she was unable to consistently get them to important service providers. She has no operator's license and has not even picked up the book to start the process. She is highly dependent on social services for her own daily needs, including a personal case manager, even when the children are in the agency's care. The award of permanent custody will allow for adoption and a stable family and life for the girls.

{¶25}  The trial court examined the factors in R.C. 2151.414(E), specifically (E)(2), (10), (15), and (16), and found by clear and convincing evidence that the children cannot be placed with either parent within a reasonable time and should not be placed with the parents. The court found that factor (E)(10)(abandonment) specifically applied to the father who has abandoned his daughters. With respect to factor (E)(2) (chronic mental illness of the parent so severe it makes the parent unable to provide an adequate permanent home at the present time and within one year), the trial court found that both parents are "diagnosed with chronic mental illness that prevents them from providing an adequate permanent home for their children now and in the next year." Specifically as to B.P., the trial court found that she has "bipolar and borderline personality disorder and is resistant to care and treatment. She has regularly demonstrated great difficulty performing the most basic parenting functions."  The trial court found that her chronic mental illness left B.P. " 'too tired' and/or 'too sick' to visit the children or work with a parent mentor." Additionally, the trial court found that her mental illness has affected the permanency of the home B.P. has provided, "She has moved in and out of her mother's home frequently, usually moving in with some man and taking the girls with her." As to the factor listed in (E)(15)(parental abuse or neglect), the trial court found that B.P.'s demonstrated neglect in

supervising the children while in her care was serious in that the then four-year-old and two and one-half-year-old children left the home on two occasions, unsupervised, without B.P.s knowledge, and were ultimately discovered by others who contacted authorities. Finally, with respect to the catch-all provision in (E)(16), the court found that B.P.'s "own dependency and demonstrated lack of ability to address basic life issues make it unsafe to return her biological children to her care and custody."

{¶26}   B.P. filed a timely appeal.

## II. Assignments of Error

{¶27}   B.P.'s counsel failed to identify assignments of error in the brief. App.R. 16(A)(3) requires appellant to include in the brief "A statement of the assignments of error presented for review, with references to the place in the record where each error is reflected." The failure of the appellant to file the assignments of error may result in dismissal of the appeal. *See* 5 Ohio Jurisprudence 3d, Appellate Review, Section 380 (2015). However, we have previously declined to dismiss an appeal where appellant's counsel failed to designate assignments of error in spite of the clear mandate of App.R. 16(A)(3). We believed it inappropriate to impose the sanction of dismissal against a party when it is counsel who is at fault. *See Metal Powder Prods., Inc. v. Admr., Ohio Bur. of Emp. Servs.,* 69 Ohio App.3d 785, 786, 591 N.E.2d 1285 (4th Dist.1990).

{¶28}   Here, where the issue presented on appeal concerns the permanent termination of parental custody, we will not dismiss the appeal as a sanction. Additionally, appellant's counsel has, in compliance with App.R. 16(A)(7), included a legal argument section preceded by a summary; and it is from this summary that we will proceed with our analysis of the merits of the appeal. *See FIA Card Servs., N.A. v. Kitchen*, 181 Ohio App.3d 557, 2009-Ohio-1295, 910 N.E.2d 9, ¶¶ 5, 11 (5th Dist.)(where pro se litigant failed to properly delineate assignments of

error pursuant to App.R. 16(A)(3), appellate court would refer to the section designated

"Probable Issues for Review" to address the merits). Thus, based upon counsel's "legal

argument" summaries, we review the following issues:

I.      TO GRANT PERMANENT CUSTODY AS THE INITIAL DISPOSITION IN
THIS CASE WAS EXTREME, CONTRARY TO LAW AND NOT IN THE
CHILDREN'S BEST INTERESTS.

II.     THE DECISION OF THE TRIAL COURT WAS AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE—THE CHILDREN CAN AND SHOULD BE PLACED
WITH THEIR MOTHER AND GRANDMOTHER IN A REASONABLE PERIOD OF
TIME.

### III. Law and Analysis

### A. Standard of Review

{¶29}   A reviewing court generally will not disturb a trial court's permanent custody

decision unless the decision is against the manifest weight of the evidence. *In re M.H.,* 4th Dist.

Vinton No. 11CA683, 2011–Ohio–5140, ¶ 29; *In re A.S.,* 4th Dist. Athens Nos. 10CA16,

10CA17, 10CA18, 2010–Ohio–4873, ¶ 7.

> "Weight of the evidence concerns 'the inclination of the greater amount of
>
> credible evidence, offered in a trial, to support one side of the issue rather than the
>
> other. It indicates clearly to the jury that the party having the burden of proof will
>
> be entitled to their verdict, if, on weighing the evidence in their minds, they shall
>
> find the greater amount of credible evidence sustains the issue which is to be
>
> established before them. Weight is not a question of mathematics, but depends on
>
> its effect in inducing belief.' "

*Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 12, quoting *State*

*v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary*

1594 (6th Ed.1990).

{¶30}   When an appellate court reviews whether a trial court's permanent custody

decision is against the manifest weight of the evidence, the court "weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest

miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Quotations

omitted.) *Id.* at ¶ 20. *Accord In re Pittman,* 9th Dist. Summit No. 20894, 2002–Ohio–2208, ¶¶

23–24.

{¶31}   In a permanent custody case, the ultimate question for a reviewing court is

"whether the juvenile court's findings * * * were supported by clear and convincing evidence."

*In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing

evidence" is:

> [T]he measure or degree of proof that will produce in the mind of the trier of fact
>
> a firm belief or conviction as to the allegations sought to be established. It is
>
> intermediate, being more than a mere preponderance, but not to the extent of such
>
> certainty as required beyond a reasonable doubt as in criminal cases. It does not
>
> mean clear and unequivocal.

*In re Estate of Haynes,* 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

{¶32}   In determining whether a trial court based its decision upon clear and convincing

evidence, "a reviewing court will examine the record to determine whether the trier of facts had

sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio

St.3d 71, 74, 564 N.E.2d 54 (1990). *Accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d

613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear

and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court

must examine the record and determine if the trier of fact had sufficient evidence before it to

satisfy this burden of proof."). "Thus, if the children services agency presented competent and

credible evidence upon which the trier of fact reasonably could have formed a firm belief that

permanent custody is warranted, then the court's decision is not against the manifest weight of

the evidence." (Citations omitted.) *In re R.M.,* 2013–Ohio–3588, 997 N.E.2d 169, ¶ 55 (4th

Dist.).

{¶33}   After the reviewing court finishes its examination, the court may reverse the

judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, "

'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must

be reversed and a new trial ordered.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541,

quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing

court should find a trial court's permanent custody decision against the manifest weight of the

evidence only in the " 'exceptional case in which the evidence weighs heavily against the

[decision].' " *Id.,* quoting *Martin* at 175; *accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721

N.E.2d 995 (2000).

{¶34}   Furthermore, when reviewing evidence under the manifest weight of the evidence

standard, an appellate court generally must defer to the fact-finder's credibility determinations.

As the *Eastley* court explained:

"[I]n determining whether the judgment below is manifestly against the weight of

the evidence, every reasonable intendment and every reasonable presumption

must be made in favor of the judgment and the finding of facts.

* * *

If the evidence is susceptible of more than one construction, the reviewing court is

bound to give it that interpretation which is consistent with the verdict and

judgment, most favorable to sustaining the verdict and judgment."

*Eastley,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, at ¶ 21, quoting *Seasons Coal*

*Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio

Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

### B. Permanent Custody Principles

{¶35}   A parent has a "fundamental liberty interest" in the care, custody, and

management of his or her child and an "essential" and "basic civil right" to raise his or her

children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re*

*Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88,

2007–Ohio–1105, 862 N.E.2d 829. A parent's rights, however, are not absolute. *In re D.A.* at ¶

11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate

welfare of the child, which is the polestar or controlling principle to be observed.' " *In re*

*Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d

54, 58 (Fla.App.1974). Thus, the state may terminate parental rights when a child's best interest

demands such termination. *In re D.A.* at ¶ 11.

{¶36}   Before a court may award a children services agency permanent custody of a

child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the

hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151, as set forth in R.C. 2151.01:

(A)  To provide for the care, protection, and mental and physical development of children * * * whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety;

(B)  To provide judicial procedures through which Chapters 2151. and 2152. of the Revised Code are executed and enforced, and in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced.

## C. Permanent Custody Framework

{¶37}  A trial court may commit an adjudicated abused, neglected, or dependent child to a children services agency's permanent custody if the court determines that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines that permanent custody is in the child's best interest of the child. R.C. 2151.353(A)(4). R.C. 2151.414(E) sets forth the factors the court must consider when determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, and R.C. 2151.414(D) sets forth the best interest factors. Consequently, before a trial court may award a children services agency permanent custody as an initial disposition, it must find (1) that one of the circumstances described in R.C. 2151.414(E)

applies and (2) that awarding the children services agency permanent custody would further the child's best interest.

### 1.  Placement With Parents

{¶38}  R.C. 2151.414(E) requires a trial court to "consider all relevant evidence" when determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent. A trial court may base its decision upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *E.g., In re C.F.,* 113 Ohio St.3d 73, 2007–Ohio–1104, 862 N.E.2d 816, ¶ 50; *In re William S.,* 75 Ohio St.3d 95, 99, 661 N.E.2d 738 (1996).

{¶39}  Here, the trial court found that R.C. 2151.414(E)(2), (10), (15), and (16) applied. B.P. limits her argument to the trial court's findings under (E)(2), (15), and (16) and does not challenge the trial court's finding of the father's abandonment under (E)(10). As relevant here, R.C. 2151.414(E)(2), (15), and (16) state that a court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if:

> * * *
>
> (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(15) The parent has committed abuse as described in section 2151.031 of the

Revised Code against the child or caused or allowed the child to suffer neglect as

described in section 2151.03 of the Revised Code, and the court determines that

the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes

the child's placement with the child's parent a threat to the child's safety.

* * *

(16) Any other factor the court considers relevant.

R.C. 2151.414(E).

## 2. Best Interest

{¶40}  R.C. 2151.414(D) requires a trial court to consider specific factors to determine

whether a child's best interest will be served by granting a children services agency permanent

custody. The factors include: (1) the child's interaction and interrelationship with the child's

parents, siblings, relatives, foster parents and out-of-home providers, and any other person who

may significantly affect the child; (2) the child's wishes, as expressed directly by the child or

through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's

custodial history; (4) the child's need for a legally secure permanent placement and whether that

type of placement can be achieved without a grant of permanent custody to the agency; and (5)

whether any factors listed under R.C. 2151.414(E)(7) to (11) apply. "In a best-interest analysis

under R.C. 2151.414(D), a court must consider 'all relevant factors,' including five enumerated

statutory factors * * *. No one element is given greater weight or heightened significance." *In re*

*C.F.,* 113 Ohio St.3d 73, 2007–Ohio–1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer,* 111

Ohio St.3d 498, 2006–Ohio–5513, 857 N.E.2d 532, ¶ 56.

**D.  B.P.'S Appeal**

{¶41}   B.P.'s first legal argument challenges the trial court's permanent custody determination as "extreme," "contrary to law" and "not in the children's best interest." B.P. then focuses on the best interest determination and argues that the factors do not support the trial court's determination that permanent custody to ACCS is in the children's best interest. Granting B.P. the benefit of the doubt, we liberally construe counsel's argument as challenging the trial court's best interest findings as against the manifest weight of the evidence.

**1.  Best Interest Analysis**

{¶42}   First, B.P. argues that the interaction and interrelationship of the children with their mother and grandmother "were mostly positive" and that "the immediate family and extended family members were providing the care and support the children required." B.P. cites no testimony or other evidence in the record to support these claims. Caseworkers testified that B.P. lacked parenting skills, supervisory skills, failed to keep important appointments the children needed, and had poor interaction with the children during scheduled visitations. The evidence showed that B.P. was very often "too tired" or "too sick" to interact with the children. The foster parent testified that B.P. failed to keep a consistent telephone call schedule with the children while they were in his care. The evidence clearly and convincingly showed that interaction and interrelationship with the immediate and extended family members were not "mostly positive." They were not "providing the care and support the children required." The children were neglected, unsupervised, and on two separate instances were outside, playing in the street with insufficient clothing and entirely without the knowledge of any of the immediate or extended family members.

{¶43}  Next, B.P. argues that the children have expressed a desire to come home. Again, B.P. cites to no evidence in the record to support this claim. R.C. 2151.414(D)(1)(b) requires a trial court to consider the child's wishes "as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]" While "it is not the reviewing court's obligation to search the record for evidence to support an appellant's argument as to any alleged error," our search of the record shows that neither the children nor the guardian ad litem testified as to the children's wishes. *State v. Ozeta*, 4th Dist. Adams No. 02CA746, 2004-Ohio-329, ¶ 18. The trial court found that the children's young ages made any statements that they may have made worthy of little weight. Because the record shows the children's ages to be five and three-and-one-half at the time of the hearing, we find ample evidence to support the trial court's decision to give this factor little weight.

{¶44}  As to the children's custodial history, B.P. states that they have lived with either her, her and her husband, or her and her mother "their entire lives—except when in foster care due to the removal by Children Services." Again, counsel provides no citation to supporting evidence in the record. Rather, the record shows that the children also lived with B.P. and several other men. During the time they were residing at one of the men's homes, they were exposed to illegal drug use and were found playing in State Route 78 in their pajamas in March. Importantly, though B.P. states the children lived with her "their entire lives" except when ACCS had custody, the amount of time spent in B.P.'s custody compared with the amount of time spent in the custody of ACCS makes her time the "exception" and ACCS's time "the rule." The record shows that the children were removed on two separate occasions from B.P.'s custody and spent two and one-half years of their young lives in the care of ACCS. The oldest child was removed from B.P.'s custody at age two, returned briefly for four months when she was three

and one-half-years old, and then removed again. At the time of the hearing, the oldest child had

been spent half of her life in the care of ACCS. The younger child was removed from B.P.'s

custody at six months of age, returned to B.P.'s care for four months when she was two years

old, and then removed again. At the time of the hearing, the youngest child had spent over two-

thirds of her life in the care of ACCS. Thus, the children's custodial history weighs against B.P.,

as the majority of the children's lives were spent in the custody of ACCS.

{¶45}  Finally, B.P. argues that a legally secure home can be achieved by giving her and

her mother co-custodial rights or giving her mother sole custody of the children. She argues that

she filed a motion with the trial court to have her mother, Z.R., appointed as co-custodian, or

alternatively, as sole custodian. However, the statutory framework governing permanent custody

complaints does not require the trial court to consider relative placement before granting

permanent custody. *In re N.S.,* 4th Dist. Hocking No. 14CA22, 2015-Ohio-1468, ¶ 40; *In re

C.T.L.A.*, 4th Dist. Hocking No. 13CA24, 2014-Ohio-1550, ¶ 52.  The trial court is not required

to find by clear and convincing evidence that no suitable relative was available for placement.

"R.C. 2151.414(D) 'does not make the availability of a placement that would not require a

termination of parental rights an all-controlling factor,' and it 'does not even require the court to

weigh that factor more heavily than other factors.' " *Id.*, quoting *In re Schaefer*, 111 Ohio St.3d

498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64.

{¶46}  The full extent of B.P.'s argument that she and her mother can be a legally secure

permanent placement is: "Grandmother's home is very suitable. It is legally secure." She states

that when she regained custody in 2014, "that household and living arrangement were deemed

appropriate at that time, and nothing significant has changed – except that Children Services has

filed a new Complaint, asking for Permanent Custody." Yet, the record shows that significant

events have occurred. The children have been found dangerously unsupervised on two separate occasions, exposed to illegal drug use, dropped from badly needed services because of B.P.'s failure to follow up properly, moved from the grandmother's home because of her excessive drinking, and have been adjudicated as neglected. Based on the record, the only thing that has not changed significantly over time is B.P.'s inability to provide adequate parenting care, support, and supervision to her children due to her chronic mental illness. As to the permanency of the home as a residence for the children, B.P.'s own testimony raises serious concerns. She testified that she left her mother's home immediately after regaining custody in 2014 because of her mother's drinking problem. The record demonstrates that her mother continues to drink alcohol. Her mother's own testimony was that she drinks alcohol on a weekly basis.

{¶47} Based upon the foregoing reasons, we find that the record contains clear and convincing evidence upon which the trial court could find that that it is in the best interest of the children to grant permanent custody to ACCS.

### 2. Placement with Parents Within a Reasonable Time

{¶48} For her second legal argument, B.P. claims that the decision of the trial court was against the manifest weight of the evidence because the children can and should be placed with their mother and grandmother in a reasonable period of time. However, as we previously discussed, the trial court did not need to consider placement with the grandmother in making its determination. *See In re N.S., supra*.

{¶49} Here, although the trial court need only find the existence of one of the factors set forth in R.C. 2151.414(E), it found three factors present as it relates to B.P. First, under (E)(2), it found her chronic mental illness is so severe that it makes her unable to provide an adequate permanent home. The trial court found factor (E)(15) applicable because B.P. had allowed the

children to suffer neglect and the seriousness, nature, or likelihood of recurrence of the neglect makes the children's placement with her a threat to their safety. Also, the trial court found under (E)(16) that B.P.'s own dependency and demonstrated lack of ability to address basic life issues make it unsafe to return her biological children to her care and custody.

{¶50} B.P. argues that there was not clear and convincing evidence that the children could not or should not be returned to their mother because there was insufficient evidence that the mother's mental illness was chronic or severe. Yet, the record contains a great deal of testimony from a number of witnesses about how the chronic, severe nature of B.P.'s bipolar and borderline personality disorder impacted her ability to parent and supervise effectively. The record reflects that B.P. lacks the ability to move forward in any meaningful manner with the basics in life. She is unable to make appointments or keep appointments; she is unable to attend counseling for herself or her children; she is unable to provide safe adequate supervision of her children; she is unable to engage actively with her children during visitations; she is unable to stick to a routine telephone call schedule with her children when they are in foster care; she is unable to move forward with divorce proceedings; she is unable to move forward with learning to drive a car; she is unable to keep or reschedule vocational services appointments; she is unable to find employment; and she is not able to consistently and properly use the transportation services offered by ACCS. B.P. is often "too tired" to care for her children. Consequently, the record contains clear and convincing evidence upon which the trial court could determine that B.P.'s chronic mental illness is so severe that it makes her unable to provide an adequate permanent home for her children.

{¶51} Even if we were to assume that B.P.'s inability to cope effectively with life and her failure to provide adequate parenting is not caused by her chronic mental illness, the trial

court found it to be a separate relevant factor under (E)(16) when it found her "own dependency and demonstrated lack of ability to address basic life issues make it unsafe to return her biological children to her care and custody."

{¶52}   Because the trial court found clear and convincing evidence of the existence of at least one of the factors in R.C. 2151.414.(E), it did not need to find any other additional factors in order to award permanent custody to ACCS.  However, the trial court also found that the parents could not and should not be awarded custody because B.P. caused her children to suffer neglect and the seriousness, nature, or likelihood or recurrence of neglect makes the placement of the children with her a threat to their safety.

{¶53}   B.P. challenges this finding, arguing that these neglectful circumstances were "isolated" and "unique" occasions. She argues that once proper locks and alarms were reactivated, the children's return to the mother's home would not pose a threat to their safety. However, this argument fails to recognize that the record shows that the locks and alarms were in place; and the children were in the grandmother's home the second time they were found outside, inadequately clothed, unsupervised, and without their mother's or grandmother's knowledge. B.P. acknowledged that all of the same circumstances that existed when she had custody in 2014 also existed at the time of the hearing. No evidence in the record exists of any new circumstance that would reduce the likelihood of recurrence of the neglect that arose from B.P.'s inability to adequately supervise her children.

{¶54}   Additionally, clear and convincing evidence exists of the serious nature of the neglect. B.P. had custody of the children for a total of sixteen weeks in 2014. After approximately eight weeks in her care, the children were found outside, unsupervised, inadequately clothed for the weather, and playing along a state route. The children stayed in

B.P.'s custody; however, and she was given a second chance. Then, just another eight weeks later, the children were again found outside, poorly dressed or entirely unclothed, unsupervised, and again B.P. had no knowledge that they had left the house. In each case, other adults found the children and notified authorities who then contacted and informed B.P. that her children had been missing. These dangerous incidents ceased being "isolated" or "unique" when they happened twice within a two-month time span of a four-month custody period. Thus, the record contains clear and convincing evidence upon which the trial court could determine that the seriousness and likelihood of recurrence of the neglect makes the children's placement with B.P. a threat to the children's safety.

{¶55}   We reject B.P.'s assertion that the trial court erred in analyzing the best interest factors in R.C. 2151.414(D)(1) and the parental placement factors in R.C. 2151.414(E). We find the trial court's award of permanent custody to ACCS is not against the manifest weight of the evidence. Accordingly, for the foregoing reasons, we overrule B.P.'s "legal arguments" and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs.

The Court finds that reasonable grounds for this appeal existed.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. and McFarland, A.J.: Concur in Judgment and Opinion.

For the Court


BY:  _____
                Marie Hoover
                Presiding Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**